**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 09-20491 Ma/P |
| | ) | |
| SHAWN BANKS, | ) | |
| | ) | |
|     Defendant. | ) | |

---

### REPORT AND RECOMMENDATION

---

Before the court by order of reference is defendant Shawn Banks's Motion to Suppress Statements. (D.E. 49.) Pursuant to the order of reference, the court held suppression hearings on the motion.   Present were Assistant U.S. Attorney Lorraine Craig, defendant Shawn Banks, and his counsel, Anne Tipton.   The court heard testimony from Memphis Police Department Detective Phillip Gooch at the first hearing and from Banks at the second hearing. The court also admitted into evidence an Advice of Rights form signed by Banks, his written statement, a photo spread, Banks's booking photo, a CD containing Banks's telephone conversations while in custody, and Banks's medical records from the Shelby County Criminal Justice Center Medical Unit.

Based on the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends

that the Motion to Suppress be denied.

## I. PROPOSED FINDINGS OF FACT

In September of 2009, officers with the Memphis Police Department ("MPD") began investigating a series of robberies of Memphis area restaurants. Detective Phillip Gooch, a member of the FBI Safe Streets Task Force, was assigned to the investigation. During the investigation, Detective Gooch received information from one of the robbery suspects, Dexter Simmons, that Banks was involved in the September 6, 2009 attempted robbery of a Jason's Deli restaurant and the September 8, 2009 robbery of a Backyard Burger restaurant. Acting on this information, Detective Gooch and MPD officers arrested Banks on September 23, 2009, in the parking lot of a Ruby Tuesday restaurant (where Banks worked). While in custody, Banks gave a statement admitting to his involvement in the attempted robbery of the Jason's Deli. Banks was later indicted for the attempted robbery of the Jason's Deli and the robbery of the Backyard Burger, and for using and carrying a firearm during those crimes.

The facts surrounding Banks's post-arrest statements are vigorously contested, as evidenced by the conflicting testimony of Detective Gooch and Banks at the hearings.

### A.   Detective Gooch's Testimony

Detective Gooch testified at the suppression hearing as follows:  At approximately 4:00 p.m. on September 23, Detective

Gooch and MPD officers observed a vehicle arrive at the Ruby Tuesday restaurant and park out front.  The vehicle was driven by an unidentified female, and Banks was sitting in the front passenger's seat.  As Banks got out of the vehicle, uniformed officers approached him, identified themselves as "police," and ordered him to place his hands on the vehicle.  Banks spontaneously uttered, "She didn't have anything to do with it."  After Banks was arrested, officers transported him to the MPD Robbery Bureau and placed him in a secure interview room, where he remained in handcuffs.

At approximately 6:24 p.m., Detective Gooch, along with Sergeant T. Wilson, met with Banks in the interview room. Detective Gooch provided Banks with a written Advice of Rights form, which contained <u>Miranda</u> warnings.  Detective Gooch read aloud the <u>Miranda</u> warnings and the officers had Banks read the <u>Miranda</u> warnings back to them to make sure that he could read and that he understood his rights.  Banks acknowledged that he understood his <u>Miranda</u> rights, stated that he wanted to talk with the officers, and signed and initialed the form.[1]  In addition, the Advice of Rights form contained seven questions, which Detective Gooch read aloud to Banks and to which Banks provided the following responses:

> 1.  Can you read and write without the aid of eye glasses?  Yes

---

[1]Detective Gooch wrote the words "Read Aloud" next to the <u>Miranda</u> warnings on the Advice of Rights form, to document what he did.

2.   Are   you   under   the   influence   of   any
     intoxicant/drugs?  No

3.   Do you suffer from any mental disorder?  No

4.   Are you in any physical discomfort that keeps you
     from participating in this interview?  No

5.   Do you understand that you are speaking with law
     enforcement personnel?  Yes

6.   What is the last grade you completed in school?
     10th - Northside / GED

7.   What have you been arrested for in the past?  Agg.
     Robbery, Forgery, Drugs

(Hearing Ex. 1.)

Detective Gooch and Sergeant Wilson then began questioning Banks about the robberies.  Banks stated that he knew Dexter Simmons, and he positively identified Simmons in a photo spread provided by the officers.  However, Banks denied having any involvement in the attempted robbery of the Jason's Deli or the robbery of the Backyard Burger.  Banks admitted to handling the gun that was used by Simmons in the Jason's Deli attempted robbery, stating that "everyone needed protection."  During the questioning, Banks was provided with food, water, and use of the restroom.[2]

Soon after making these statements, Banks stated that he wanted to speak with a lawyer and to speak with his mother.  The officers immediately ceased all further questioning.  Both of the

---

[2]Detective Gooch documented in his report the exact times that Banks was taken to the restroom and provided with food and water during the questioning.

officers left the interview room, at which time Detective Gooch started preparing the paperwork to book and process Banks. Approximately thirty minutes later, Detective Gooch returned to the interview room to transport Banks downstairs to be booked and processed. When Banks asked Detective Gooch where they were going, Detective Gooch responded that he was taking Banks downstairs to be booked. In response, Banks stated, "Hey, I didn't say that I didn't want to make a statement but I do want to talk to my mother." Banks stated that he wanted to let his mother know that he was downtown being interviewed, he wanted to have her turn the home telephone on so that he (Banks) could call her, and he wanted to tell her that he loved her. Detective Gooch, using his cell phone, called Banks's mother for him and gave her Banks's message.[3]

Immediately after Detective Gooch finished making the call, Banks stated that he was not involved in the Backyard Burger robbery, but admitted to being involved in the Jason's Deli attempted robbery. Detective Gooch did not respond to this statement, but instead left the interview room to tell Sergeant Wilson what Banks had said. At around 10:50 p.m., Detective Gooch and Sergeant Wilson returned to the interview room and re-advised Banks of his <u>Miranda</u> rights, and Banks waived his rights. To

---

[3]This was the only time that Detective Gooch was alone with Banks in the interview room. Also, the only time that Sergeant Wilson was alone with Banks in the interview room was when Detective Gooch stepped out of the room briefly to get water for Banks.

document this event, the officers typed a waiver form that was read

aloud and initialed by Banks.  The form stated as follows:

> You are under arrest and may be charged with Attempted
> Aggravated Robbery in connection with this complaint.
>
> We are going to ask you some questions regarding the
> above complaint.  You have the right to remain silent and
> anything you say can be used against you in a court of
> law.  You have a right to have a lawyer, either of your
> own choice, or court appointed if you are unable to
> afford one, and to talk with your lawyer before answering
> any questions, and to have your lawyer with you during
> questioning if you wish.
>
> Q:   Do you understand each of these rights I have
>      explained to you?
>
> A:   Yes.  SB
>
> Q:   Having these rights in mind do you wish to make a
>      statement at this time?
>
> A:   Yes.  SB
>
> Q:   When we originally talked to you, you mentioned
>      that you may want to speak with your attorney and
>      your mother and we (Gooch and Wilson) left the
>      room.  Is this correct?
>
> A:   Yes.  SB
>
> Q:   When you were about to be taken downstairs, you
>      then said that you did wish to give a statement.
>      Is that correct?
>
> A:   Yes.  SB

(Hearing Ex. 2.)  Banks initialed the responses with "SB" and then

proceeded to provide a statement admitting that he supplied Simmons

with the gun used during the attempted robbery of the Jason's Deli

and that he drove the get-away car.  After the officers typed his

statement, Banks reviewed the written statement and initialed the

-6-

bottom corners of the statement.  However, when he got to the last page and was asked to sign the statement, Banks asked the officers about the possibility of receiving a "gun charge," to which Detective Gooch responded that he could not make any promises about what he would be charged with.  Banks refused to sign the last page of the statement.

Afterwards, Banks was taken downstairs to be booked and processed.  As part of the standard booking procedures, Banks was taken to the nurse for a medical clearance, and his photograph was taken.

**B.    Banks's Testimony**

Banks testified at the suppression hearing as follows:  At approximately 4:00 p.m. on September 23, his girlfriend dropped him off at the Ruby Tuesday.  As Banks got out of the vehicle, he was approached by approximately six to seven police officers who "came out of nowhere" and had their guns drawn.  The officers, who were wearing bulletproof vests but did not identify themselves as police, demanded that Banks get down and not move.  Banks did not know what was going on and did not know that the individuals were police officers.  Unaware of the officers' intentions, Banks immediately placed his hands on top of the police car and stated that "we didn't have nothing to do with this."  The officers handcuffed Banks, transported him to the Robbery Bureau, and placed him in an interview room.  In the interview room, Detective Gooch

-7-

prepared an Advice of Rights form, which Banks initialed and signed in the presence of Detective Gooch and Sergeant Wilson.  Banks then began to talk to the officers, claiming "he had nothing to hide." He denied having any involvement in or knowledge about the robberies he was being questioned about.  Banks then asserted his right to counsel, but the officers ignored his request and continued to question him.  Sergeant Wilson, specifically, seemed to get angry with him and asked why he needed an attorney if he had nothing to hide.   The officers then left the interview room. Shortly after they left, Sergeant Wilson returned to the room by himself and brought with him a file containing Simmons's written confessions.  Sergeant Wilson then began to yell at Banks in a "loud and boisterous" voice stating, "You had something to do with these robberies, didn't you?"  Banks continued to deny his involvement and again asked to speak with an attorney.  Sergeant Wilson ignored the request and instead began to hit Banks on the back of the neck with an open hand while urging him to confess to the robberies.  After approximately three or four hits to Banks's neck, Sergeant Wilson left the room.  Banks was never allowed to speak with an attorney, nor did the officers ever offer him any water, food, or use of the restroom.

Both officers then returned to the interview room and asked Banks whether he was sure that he did not want to make a statement. This time, when Banks asked for an attorney, he asked if he could

-8-

at least telephone his mother so that she could obtain an attorney
for him.   Sergeant Wilson told Detective Gooch to call Banks's
mother, that they did not have time to deal with him, and that it
was too late to call an attorney.   After Detective Gooch called
Banks's mother, Detective Gooch typed a written statement for Banks
to sign.   Banks did not read the statement, and he only initialed
the pages because Sergeant Wilson kept hitting him while Detective
Gooch watched.   Banks ultimately refused to sign the statement
because he felt he was being forced to sign something that was
untrue.

The officers subsequently transported Banks to booking and
processing, where he underwent a medical clearance.   Banks
complained of headaches and a stiff neck to a nurse, who provided
him with Tylenol and informed him that if he had any further
complaints, he would have to fill out a request for medical
services.  Over the next several months while Banks was in custody,
he submitted several health services requests alleging that both
Detective Gooch and Sergeant Wilson beat him during the
interrogation and that he suffered from severe headaches as a
result.   Some examples of the health service request forms that
Banks filled out include the following:

Form dated September 25, 2009: On the 9/24/09 I
complained to medical about severe head aches.  Because
when I was being interrogated Det. Wilson and Det. Gooch
got made bcuz I wanted a lawyer.  They wouldn't leave me
alone.  They kept messing with me hitting me across the
head sayin I know what is goin on, its continuous head

ache.  They said if I said something they'd hide  me.
But I decided to go ahead and tell someone.  It wasn't
right and it was some pure bullshit but I need some kind
of medicine it hurt so bad.

Form dated September 27, 2009: Constant none stop head
aches and pains.  I asked for some when I was being book
and never got anything for it.  Which was the direct
result of me asking for a lawyer when I was being
interviewed (Det. Gooch and Det. Wilson).  They kept
talking to me trying to convince me I don't need a lawyer
which I knew was meaning some bull.  You know the rest.
Please give me some medicine.  They constantly hit me
across my head.  Understand god don't like ugly.

Form dated October 2, 2009:  Constant headaches and pain.
Consistent with being assaulted by officers I mean Det.
Gooch and Det. Wilson.  Also it's very sharp deep pains.
Some nights I'm unable to sleep at all.

Form dated October 5, 2009:  I'm having constant
headaches.  Also now I'm having constant stiffness in the
neck area.  I've complained about this before.  It hasn't
stopped.  As a matter of fact it has gotten worse.  It
happened and started after I asked for a lawyer and when
I wouldn't sign this bogus statement from Det. Gooch and
Det. Wilson.

Form dated October 8, 2009: Repeated neck pain and
stiffness.  Also constant headaches and sharp migraines.
Which I've never had a history of.  It started when I was
being interrogated by Detectives Gooch and Wilson.  They
constantly hit and smacked me across my head because I
asked for a lawyer.  I wouldn't sign that bogus ass
statement.

(Hearing Ex. 6.)

## C.  Credibility of the Witnesses

The  court  finds  the  testimony  of  Detective  Gooch  to  be

credible  and  the  testimony  of  Banks  to  be  not  credible,  and

therefore the court adopts the testimony of Detective Gooch as its

Proposed Findings of Fact.  In addition to the witnesses' demeanor

-10-

while they testified at the hearings, the court's credibility determinations are based on the following findings. Detective Gooch's testimony is supported by the exhibits, which show that Banks was provided with written <u>Miranda</u> warnings initially, he signed the rights waiver form, and when Banks re-initiated communications with the officers after invoking his right to counsel, the officers carefully documented Banks's second <u>Miranda</u> warnings, including documenting the fact that he wanted to talk to the officers about the robberies after having previously invoked his right to counsel. Moreover, Detective Gooch carefully documented in his supplement report the exact times that Banks was provided with food, water, and use of the restroom.

There is no credible evidence that the officers continued to question Banks after he invoked his right to counsel and before he re-initiated communications with the officers, or that the officers physically or mentally abused Banks to coerce a confession out of him. Banks did not claim that the officers assaulted him until after he spoke to Detective Gooch on the phone on September 25, when Banks learned that he could be charged federally.[4]   It is

---

[4]On the day after his arrest, Banks called Detective Gooch on his cell phone to ask about his potential charges. During this recorded call, Banks made no mention of the officers' alleged refusal to allow him to speak with an attorney or the alleged physical abuse. It was only after Banks learned that he could be charge federally that he started to complain to the detention facility about the alleged assault. The court notes that the forms filled out by Banks indicate that he complained of abuse at the hands of both Detective Gooch and Sergeant Wilson, while at the

obvious that after September 25, Banks submitted the health service request forms with self-serving statements for the sole purpose of creating a paper trail that he could later use to support his false allegations of police misconduct.  His booking photo shows no signs of any injuries, the medical records do not show that he complained of the assault when he saw the nurse for his medical clearance, and despite his many complaints of headaches, the medical records do not support Banks's allegations of abuse.

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Statement at Scene of Arrest

When Banks was arrested in the parking lot of the Ruby Tuesday restaurant, he spontaneously uttered, "She didn't have anything to do with it."  It is unclear whether Banks's Motion to Suppress seeks suppression of this statement.  In any event, "'[v]olunteered statements of any kind are not barred by the Fifth Amendment . . . .'"  Rhode Island v. Innis, 446 U.S. 291, 300 (1980) (quoting Miranda v. Arizona, 384 U.S. 436, 478 (1966)); see also United States v. Ortkiese, 208 F. App'x 436, 440 (6th Cir. 2006) (finding no Fifth Amendment violation when defendant voluntarily made incriminating statements to police officers as he sat on his living room couch while the officers searched his home); United States v. Cole, 315 F.3d 633, 636 (6th Cir. 2003) (finding no Fifth Amendment

─────────────────────

suppression hearing he testified that only Sergeant Wilson beat him and that Detective Gooch only stood by and watched.

violation when defendant made incriminating statement that he owned
a gun discovered by police officers because police did not ask
defendant any questions about gun ownership or possession and took
no actions that were likely to elicit an incriminating response);
United States v. Murphy, 107 F.3d 1199, 1205 (6th Cir. 1997)
(finding no Fifth Amendment violation when defendant made
voluntary, incriminating statements in a police car after he was
escorted to the police car outside his home and left in it for a
few minutes while he could be identified).   Because Banks's
statement was not made in response to any police interrogation, the
statement should not be suppressed.

**B.   Banks's Post-Arrest Statement**

1.   Banks's Waiver of His Right to Counsel

Banks claims that the officers violated his constitutional
rights by interrogating him after he invoked his right to counsel.
In Miranda, the Supreme Court held that before beginning custodial
interrogation, the police must advise suspects of their right to
remain silent and right to the presence of an attorney.   Id. at
479.   With respect to the right to counsel, the Court stated:

> Once warnings have been given, the subsequent procedure
> is clear. . . .   If the individual states that he wants
> an attorney, the interrogation must cease until an
> attorney is present.   At that time, the individual must
> have an opportunity to confer with the attorney and to
> have him present during any subsequent questioning.   If
> the individual cannot obtain an attorney and he indicates
> that he wants one before speaking to police, they must
> respect his decision to remain silent.

-13-

Id. at 473-74; see also Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (stating that if a defendant invokes his right to counsel, the police must honor it and all questioning must cease).  Once "an accused . . . expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further investigation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards, 451 U.S. at 484-85; see also Davis v. United States, 512 U.S. 452, 458 (1994). In order to find that a defendant has re-initiated communication with the police, the court must determine whether the communication reflects "a desire on the part of the accused to open up a more generalized discussion relating directly or indirectly to the investigation" or whether it was merely an "inquiry arising out of the incidents of the custodial relationship."  Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983).

In this case, it is undisputed that before giving his written statement, Banks invoked his right to counsel.  As stated above, the court credits Detective Gooch's testimony that he and Sergeant Wilson immediately ceased further questioning at that point.  When Detective Gooch returned to the interview room thirty minutes later to transport Banks to booking, Banks re-initiated communication with the detective when he stated, "Hey, I didn't say that I didn't want to make a statement but I do want to talk to my mother."

-14-

After Detective Gooch called Banks's mother at Banks's request, Banks freely admitted to being involved in the attempted robbery of the Jason's Deli.  Detective Gooch went to get Sergeant Wilson, and they both returned to the interview room and re-advised Banks of his Miranda rights.  In doing so, they documented the fact that Banks had previously invoked his right to counsel and that it was Banks who re-initiated communication with the officers when he was about to be taken to booking.  Under these facts, Banks voluntarily re-initiated communication with the officers regarding the robberies, he was administered his Miranda warnings again, and he knowingly and intelligently waived his right to counsel.

    2.   Coercion

    Finally, Banks argues that his statement was obtained as a result of police coercion.  In order to prevail, Banks must prove that: "(1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) defendant's will was, in fact, overborne as a result of the coercive police activity."  United States v. Rigsby, 943 F.2d 631, 635 (6th Cir. 1991) (citing McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988)).  The court must consider the totality of the circumstances in determining whether the defendant's will has been overborne in a particular case.  Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir. 1994).  "Factors to consider in assessing the totality of the circumstances include the age, education, and

-15-

intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questions; the repeated and prolonged nature of the questions; and the use of physical punishment, such as the deprivation of food or sleep." Id.

As stated above, there is no evidence to support Banks's claims of coercion. To the contrary, the officers advised Banks of his Miranda rights both orally and in writing. He informed the officers that he was not under the influence of any intoxicants or drugs, he did not suffer from any mental disorder, he did not have any physical discomfort, he reached the tenth grade and earned a GED, and he had prior experience with dealing with law enforcement, based on his prior arrests for aggravated robbery, forgery, and drugs. Banks was aware that he had the ability to say "no," and in fact he invoked his right to counsel during the initial questioning. The officers immediately stopped questioning him when he invoked his right to counsel, they provided him with food, water, and use of the restroom, they advised him again of his Miranda rights when he re-initiated communication with Detective Gooch, and they did not force him to sign the written statement when he refused to do so. Finally, the interrogation lasted for a reasonable amount of time. The court finds that, based on the totality of the circumstances, Banks's statement was not obtained as the result of any coercion or police misconduct.

## III.   RECOMMENDATION

For the reasons above, the court recommends that the Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

November 17, 2010
Date

**NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(c).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**